IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-20107-02-JWL-2 |
| ) | |
| EMMA JEAN HOLMES, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM AND ORDER**

On August 12, 2009, Emma Jean Holmes was indicted for conspiring to commit fraud through various real estate and related mortgage transactions between July and September 2004. This matter is before the Court on Ms. Holmes's Motion to Suppress (doc. #21) certain statements made to special agents of the Internal Revenue Service's Criminal Investigation Division in 2006 and 2008 on the grounds that the agents failed to give her Miranda warnings before eliciting the statements. On December 22, 2009, the Court conducted a hearing on the motion, at which the parties presented testimony and arguments. For the reasons set forth herein, the motion is denied.

I. Facts

Weighing the testimony and credibility of the witnesses at the hearing on the motion,[1] and for the limited purpose of resolving the motion, the Court finds the following facts:

*Interview with Agent Glaser*

On February 10th, 2006, Special Agent Travis Glaser questioned Ms. Holmes at her residence regarding three different applications for home loans purportedly containing her signature. Agent Glaser had been conducting an investigation into another individual and had uncovered files containing information on Ms. Holmes's loan applications. He noticed that all three applications stated that they would be "owner occupied" and that each listed a different income amount for Ms. Holmes. Feeling something was amiss, Agent Glaser called Ms. Holmes to determine whether she would be willing to speak with him. He believed Ms. Holmes might have been a victim purchaser, as he had come across others similarly situated during his recent investigations. He told Ms. Holmes he would like to speak with her regarding the home purchases and Ms. Holmes agreed, suggesting that he visit her home for the interview. They established a mutually agreeable time for the visit. When he visited her, Agent Glaser dressed in business casual attire and concealed his firearm. He identified himself as an IRS Special Agent with the Criminal Investigation Division, as he had on the phone

---

[1] At the hearing, the Government presented testimony from Henry Herron and Travis Glaser, special agents with the Internal Revenue Service's Criminal Investigation Division. Ms. Holmes offered only her testimony at the hearing.

earlier. They sat at Ms. Holmes' kitchen table and discussed the three particular transactions. He stated that he never provided Ms. Holmes *Miranda* warnings because he believed her to be a victim and he was interviewing her for the purpose of determining whether she might serve as a witness in the prosecution of the individual he was investigating. Indeed, while Ms. Holmes stated that she felt "nervous" going into the interview, she testified that she did not consider herself to be under investigation. The interview lasted from thirty minutes to one hour. During this time, Agent Glaser presented documents to Ms. Holmes and asked her questions regarding the various transactions at issue. Ms. Holmes was never restrained or confined within the home. Agent Glaser never specifically stated to Ms. Holmes that she did not have to answer his questions, but Ms. Holmes never refused to answer any questions. Statements Ms. Holmes made during the course of the interview confirmed Agent Glaser's belief that Ms. Holmes was a victim and that she might serve as a useful witness. When finished with the interview, Agent Glaser notified Ms. Holmes that she might be contacted to serve as a witness and he characterized her in his subsequent memorandum of interview as a "witness." He had no further contact with her.

*Interview with Agent Herron*

While investigating yet another individual suspected of mortgage fraud, Agent Herron uncovered evidence concerning loan applications and transactions entered into by Ms. Holmes and Mr. Wildor Washington, Sr., her co-defendant. Suspecting a connection between the individual Agent Herron had been investigating and Mr. Washington, Sr.,

3

Agent Glaser also notified Agent Herron that Ms. Holmes had represented herself to be a victim during his own conversation with Ms. Holmes. Agent Herron therefore wished to speak with Ms. Holmes as a potential witness in his own investigation. Agent Herron telephoned Ms. Holmes at her job, identified himself as a Special Agent, and asked if Ms. Holmes would be willing to speak with him concerning the transactions she had entered into with Mr. Washington. She agreed, and they set a mutually agreeable time for the meeting. As Agent Herron had a significant number of documents to present and discuss with Ms. Holmes,[2] he invited her to visit with him at a field office, a location where other victims and witnesses had been interviewed.[3]

The interview occurred on August 1, 2006. Ms. Holmes drove to the field office herself. The interview was conducted in a "secured" room, meaning that those inside could leave the room at any time but that those outside of the room could not enter. Agent Herron dressed in business casual attire and concealed his firearm during the entire interview. Another agent identified as "Agent Ryan" also participated in the interview, and while he potentially had a firearm on him as well, it was not visible. The interview lasted approximately one hour. The agents never gave Ms. Holmes *Miranda* warnings, as they viewed her as a victim and potential witness. Moreover, they did not consider Ms. Holmes to be "in custody." When the interview began, Ms. Holmes asked whether she

---

[2] Before Agent Herron's interview with Ms. Holmes, Agent Glaser provided Agent Herron with the documents that he had discussed with her during his interview in February.

[3] Ms. Holmes met with Agent Herron at a Secret Service Field Office, which headquartered the Financial Crimes Task Force. Mr. Herron did not have his office in that particular location.

should have an attorney present.[4] The agents told her that she was welcome to have one present, but that they could not recommend a particular attorney to her. Ms. Holmes chose to proceed with the interview without an attorney present. Ms. Holmes testified that she did not feel as if she were under investigation. She did state that she felt she did not have the right not to speak with them, or to leave, but she admitted during cross examination that she did not feel as if she were under arrest at any point during the interview. The agents never told Ms. Holmes that she had to answer their questions. When they initiated the interview, they believed her representations to Agent Glaser that she was in fact a victim.

During the interview, the agents showed Ms. Holmes various documents and then asked her questions concerning the documents. Ms. Holmes never asked that the interview be stopped and she never refused to answer any question posed. However, based upon her responses, the agents came to believe that Ms. Holmes had signed the loan applications in question, knowing them to contain false information, and that she had received money for doing so. Once her potential criminal liability became apparent to the agents, they told Ms. Holmes that they were no longer comfortable going forward with the interview, as it appeared that she was not in fact a victim but rather might be criminally responsible. Ms. Holmes continued to try to explain the situation, and the agents advised her to hire an attorney and have the attorney call them. They then

---

[4] At the time, Ms. Holmes was represented by Charlie Erickson, an attorney she had retained for the purposes of her pending bankruptcy proceeding.

requested that she leave, and she left freely. The agents never arrested Ms. Holmes nor did they restrain her in any manner during the interview.

*Encounter at Ms. Holmes' Workplace*

At some point during 2008,[5] Agent Herron went to Ms. Holmes' place of employment to have her sign an affidavit acknowledging that the loan applications contained her signature. As Ms. Holmes contested whether one of the signatures was her own, she acknowledged only her signature on the other two applications. Agent Herron did not show his badge to Ms. Holmes while in the presence of her co-workers. Rather, he stated that he had documents for her to sign, and she then directed him into a separate room, where she quickly signed the affidavit and requested that he leave. He did not provide her with Miranda warnings as he did not consider her to be "in custody." As a result, he did not explain to Ms. Holmes that she could choose not to sign the affidavit. Agent Herron, however, did not arrest Ms. Holmes nor restrain her freedom of movement.

II. Analysis

Ms. Holmes requests that this Court suppress any statements made to the agents on the grounds that they did not provide her with *Miranda* warnings. *Miranda* warnings are required when the defendant is in custody and subject to interrogation. *United States v.*

---

[5] Ms. Holmes could not recall when Agent Herron went to her place of employment, but agreed that it may have occurred at some point in 2008.

*Griffin*, 7 F.3d 1512, 1517-18 (10th Cir. 1993) (citations and quotations omitted). The controlling issue here is whether Ms. Holmes was in custody for purposes of triggering *Miranda* when she was questioned by and made statements to the IRS Agents.

In determining whether or not a person is in custody for *Miranda* purposes, the only relevant inquiry is how a reasonable person in the suspect's position would have understood her situation. *Id.* at 1518 (citing *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). A person is in custody if, from an objective viewpoint, someone in her position would reasonably believe that her freedom of action has been curtailed to a "degree associated with a formal arrest." *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) and *Berkemer*, 468 U.S. at 440)). A reasonable person "does not have a guilty state of mind." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). However, "[a] suspect can be placed in police 'custody' for purposes of *Miranda* before he has been 'arrested' in the Fourth Amendment sense." *United States v. Perdue*, 8 F.3d 1455, 1463-64 (10th Cir. 1993) (citing *Berkemer*, 468 U.S. at 442).

The determination of whether an individual is in custody must be made from an examination of the totality of the circumstances. Therefore, it is necessarily a fact intensive inquiry. *See Jones,* 523 F.3d at 1240 (quoting *Griffin*, 7 F.3d at 1518). The Tenth Circuit has identified some factors useful in analyzing custody for *Miranda* purposes: (1) the extent to which the suspect was made aware that he was free to refrain from answering questions or to end the interview at will; (2) the nature of the questioning, including whether the questioning was prolonged and accusatory; and (3)

7

whether the police dominated the encounter. *See id.* In looking to whether the circumstances indicated that the police dominated the encounter, the following are helpful indicators:

> [S]eparation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id*.

Looking to the totality of the circumstances, the Court concludes that a reasonable person in Ms. Holmes's position would not have viewed any of the encounters with the IRS agents as curtailing her freedom of action to a "degree associated with formal arrest." *Beheler*, 463 U.S. at 1125. The Court addresses each encounter separately.

*Interview with Agent Glaser*

Agent Glaser interviewed Ms. Holmes in her own home after Ms. Holmes invited him there. She voluntarily agreed to speak with him and never requested that Agent Glaser cease his questioning. Agent Glaser never restrained Ms. Holmes. While Agent Glaser did not notify Ms. Holmes that she did not have to answer his questions at the interview itself, he did not do so because he perceived of Ms. Holmes as a victim, a perception perpetuated by Ms. Holmes's own representations during the course of the

interview. Therefore, Ms. Holmes was not subjected to accusatory questioning.⁶ Lastly, the questioning did not occur in a "police dominated" setting but rather Ms. Holmes's own residence. Therefore, the Court concludes that the interview conducted by Agent Glaser on February 10th, 2006 was not "custodial" in nature. *See Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (concluding that defendant was not in "custody" during an interview with IRS agents where the agents questioned him in a private home he occasionally stayed in).

*Interview with Agent Herron*

Based upon the representations made by Ms. Holmes at her interview with Agent Glaser, Agent Herron believed that Ms. Holmes might prove a useful witness in his own investigation. When he called Ms. Holmes to see if she would be willing to speak with him, Ms. Holmes voluntarily agreed to the interview. They decided to meet at a mutually agreeable time. Ms. Holmes drove herself to the field office for the interview and left afterwards without any hindrance. Although the interview occurred in a field office, a "noncustodial situation," such as where the individual voluntarily agrees to speak with law enforcement, "is not converted to one in which Miranda applies simply because a

---

⁶ Although the Supreme Court has recognized that an officer's unarticulated, subjective belief as to whether the individual qualifies as a suspect or not has no bearing upon the *Miranda* custody inquiry, it has recognized that "an officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," as they would then affect how a reasonable person being interviewed would view his or her "'freedom of action.'" *Stansbury v. California*, 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (quoting *Berkemer*, 468 U.S. at 440). Therefore, Agent Herron's belief in Ms. Holmes's status as a potential witness has relevance insofar as his belief caused him to act in a certain manner towards Ms. Holmes.

9

reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Indeed, the Supreme Court has concluded that even a suspect is not in "custody" where he voluntarily agrees to accompany law enforcement to a police station for questioning, is not placed under arrest, and is permitted at the end of a brief interview to leave unhindered. *Beheler*, 463 U.S. at 1125. *See also United States v. Chee*, 514 F.3d 1106, 1113 (10th Cir. 2008). Therefore, in determining whether Ms. Holmes was in "custody," the Court finds particularly persuasive that Ms. Holmes agreed to the interview, voluntarily drove to the arranged meeting location herself, and was permitted to leave at the end of the interview—indeed, at the insistence of the agents.

Moreover, the nature of the questioning at the interview with Agent Herron weighs against a finding that Ms. Holmes was in "custody." The Court finds credible the testimony of Agent Herron that he interviewed Ms. Holmes as a potential witness, believing her to be a victim. Therefore, Ms. Holmes was not subjected to the sort of "prolonged accusatory questioning….likely to create a coercive environment from which an individual would not feel free to leave." *Griffin*, 7 F.3d at 1518. Indeed, as soon as the agents suspected criminal wrongdoing, they terminated the interview and recommended that she consult with counsel. During the interview, the agents never made their weapons visible or otherwise indicated that Ms. Holmes was required to submit to their authority. She remained cooperative throughout the interview and never asked to

leave nor stated that she no longer wished to answer questions.[7] Although the interview occurred in an enclosed, secured room, those inside the room could leave and the agents took no action to suggest to Ms. Holmes that she would not be permitted to leave if she wished to.[8] Therefore, viewing all the circumstances, the Court concludes that a reasonable person in Ms. Holmes's position would not believe she was effectively under arrest and that Ms. Holmes, therefore, was not in "custody" for *Miranda* purposes.[9]

---

[7] Ms. Holmes did ask when she first entered the interview whether she should have counsel with her. However, the agents explained that she was welcome to have counsel and she voluntarily chose to go forward with questioning regardless. Moreover, she admitted during cross examination that Agent Herron had not attempted to interfere with her ability to have an attorney present.

[8] Ms. Holmes testified that felt she did not have the right to leave nor to refuse to speak with the agents. However, she also admitted that she never felt as though she were under arrest, or even under investigation. Moreover, the relevant question is not what Ms. Holmes subjectively believed at the time of the interview as to her custodial status, but rather what a *reasonable person* in her situation would have believed. Viewing the totality of the circumstances, the Court concludes that a reasonable person in Ms. Holmes's position would have felt free to terminate the interview or to refuse to answer the questions posed.

[9] Ms. Holmes argued during the hearing that the agents had documentation before they initiated questioning that should have warned them of her potential criminal responsibility, and that the agents therefore should have provided her with Miranda warnings before questioning began. However, a law enforcement officer's subjective view regarding whether the individual interviewed qualifies as a "suspect" is irrelevant to the determination of whether the person is in "custody" for *Miranda* purposes. *See Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (explaining that the "custody" determination does not depend upon the "subjective views harbored by either the interrogating officers or the person being questioned"). As noted above, the agent's belief as to whether the interrogated individual qualifies as a "suspect" has relevance only if conveyed in some manner to the individual, such that it would impact how a reasonable person would view the situation. Ms. Holmes has not presented the Court with any relevant evidence in her favor on this point.

*Encounter at Ms. Holmes's Workplace*

Agent Herron testified that he went to Ms. Holmes's place of employment at some point during 2008 to have her sign an affidavit acknowledging that her signature appeared on the allegedly falsified loan applications. According to Ms. Holmes, Agent Herron should have provided her with Miranda warnings prior to requesting that she sign such an affidavit, as she had been suspected of criminal activity at that point for approximately two years. As the Court has explained, however, the agent's subjective view of the individual's criminal responsibility is irrelevant for *Miranda* purposes. *United States v. Wynne*, 993 F.2d 760, 764 (10th Cir. 1993) ("A policeman's unarticulated plan has no bearing whether a suspect was 'in custody' at a particular time…") (quoting *Berkemer*, 468 U.S. at 442). The only relevant question is whether a reasonable person in Ms. Holmes's position would have viewed the encounter as depriving her of freedom of action "in a significant way" or curtailing it to a "degree associated with formal arrest." *Chee*, 514 F.3d at 1112.

Agent Herron did not restrain Ms. Holmes during the encounter at her work, nor use threats or inducements to get her to sign the affidavit. Indeed, Ms. Holmes refused to admit that one of the loan applications contained her signature, indicating that the circumstances were not such that a reasonable person in her position would feel coerced into signing the affidavit at the agent's request. The fact that Ms. Holmes requested that Agent Herron leave immediately after she signed the affidavit also suggests that she felt free to terminate the encounter. When he initially approached her, Agent Herron did not

12

display his badge in front of her co-workers. Rather, he waited until after Ms. Holmes had ushered him into a separate room. Lastly, the interaction did not occur in a police dominated environment, but rather Ms. Holmes's own place of employment. Therefore, the Court concludes that a reasonable person in Ms. Holmes's position would not have viewed the encounter as the "functional equivalent of formal arrest." *Chee*, 514 F.3d at 1112 (quoting *Berkemer*, 468 U.S. at 442. *See United States v. Blackwell*, 182 Fed. App'x 812, 815 (10th Cir. May 31, 2006) (unpublished opinion) (concluding that a reasonable person would have felt free to terminate an interview with three FBI agents who appeared at his workplace). *See also United States v. Allen*, 699 F.2d 453, 459 (9th Cir. 1982) (concluding that the defendant was not in "custody" when contacted by ATF agents at his place of employment during business hours, where he was not physically restrained, threatened, or otherwise pressured to answer questions).

**IT IS THEREFORE ORDERED BY THE COURT THAT** Ms. Holmes's Motion to Suppress (doc. #21) is **denied**.

**IT IS SO ORDERED** this 19th day of January, 2010.

                                                            s/ John W. Lungstrum
                                                            John W. Lungstrum
                                                            United States District Judge