IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA.,           )
                                     )
                    Plaintiff,       )
                                     )
        v.                           )        Case No. 09-20107-2-JWL
                                     )
EMMA JEAN HOLMES                     )
                    Defendant.       )
                                     )
_____    )


## MEMORANDUM AND ORDER


On August 12, 2009, an Indictment was filed charging defendant Emma Jean

Holmes and Wildor Washington, Sr. with various federal offenses arising from an alleged

scheme to purchase real estate using fraudulently obtained mortgages.  On March 5th,

2010, a jury convicted Ms. Holmes on four of these felony charges: conspiracy to

defraud, wire fraud in violation of 18 U.S.C. § 1343, commercial carrier fraud in

violation of 18 U.S.C. § 1341, and money laundering in violation of 18 U.S.C. § 1956.

The matter is currently before the Court on Ms. Holmes's Motion for New Trial (doc. #

108) and Motion for Judgment of Acquittal (doc. # 110).  As explained more fully herein,

the Court denies Ms. Holmes's Motion for New Trial.  As for Ms. Holmes's Motion for

Judgment of Acquittal, the Court grants the Motion as concerns Ms. Holmes's conviction

for money laundering under 18 U.S.C. § 1956, but otherwise denies the Motion.

I.  Factual and Procedural Background

*The Fraudulent Loan Applications*

The testimony at trial established that Ms. Emma Jean Holmes purchased three residential properties in Johnson County, Kansas.  Mr. Washington, Sr. acted as the mortgage broker for each of the transactions.[1]  The loan applications submitted for the purpose of obtaining these residential properties contained inaccurate and false information.  Each application required Ms. Holmes to disclose her annual income and to indicate whether she intended to use the property as her primary residence.  The applications each overstated her income and assets, and falsely indicated that she would use the property as her primary residence.[2]  At trial, Ms. Holmes testified that she intended for the houses to be investment properties, with renters who would pay the mortgages.  She stated that Mr. Washington, Sr. had proposed the idea of investment properties and assured her that he would take care of everything.  Ms. Holmes appeared at the closing for each of the properties and signed documents relating to the purchases at closing.[3]  However, she testified that she did not provide the inaccurate information contained in the loan applications.  She stated instead that she had provided the

[1] Mr. Washington, Sr. was charged as co-defendant, but the trials were severed in order to avoid any issues with the admission of their respective testimony.

[2] Kimberly Fine, a branch manager at BNC Mortgage, testified that a loan for a residence intended to be used as a primary residence generally has better terms than other types of loans, making it more advantageous to the borrower.

[3] Mr. Washington, Sr.'s signature appeared on one of the loan applications, the application for property located at 7917 W. 155th Place, Overland Park, Kansas.  At his own trial, Mr. Washington, Sr. testified that he did not prepare the loan applications containing the false information, and that the one signature that appeared on the loan application for 7917 W. 155th Place was not his own signature, but rather a forgery.

information to Mr. Washington, Sr. via fax or telephone communications.[4]  She also

claimed not to have signed the real estate contracts for the purchases or the loan

applications, asserting that the signatures were forgeries.[5]  In furtherance of this defense,

Ms. Holmes presented evidence concerning a simultaneous mortgage fraud scheme

conducted by Mr. Washington, Sr.'s son, Wildor Washington, Jr. (Bill Washington, Jr.)

and his girlfriend, Victoria (Ima) Bennett, a scheme which involved the use of forged

signatures.  For example, Ms. Holmes introduced testimony Ms. Bennett provided as a

witness in another criminal prosecution concerning the fraudulent scheme she engaged in

with Bill Washington, Jr.  Ms. Holmes also pointed to evidence introduced concerning

Ms. Bennett's role in her loan transactions, apparently contending that those involved in

the Bill Washington, Jr.-Ima Bennett fraud scheme were responsible for the fraudulent

signature appearing on the loan application.  She also presented herself as an unwitting

victim of Mr. Washington, Sr.'s fraudulent activity.

However, during the course of an Internal Revenue Service investigation into

these matters, Special Agent Henry Herron interviewed Ms. Holmes.[6]  According to

Special Agent Herron, he interviewed Ms. Holmes due to her prior representations that

---

[4] According to Ms. Holmes, she was asked to fax to Mr. Washington, Sr. W-2s, a bank
statement, a check stub, and any outstanding bills.

[5] However, at trial, Ms. Holmes did admit to signing certain other documents at closing,
knowing that they contained inaccurate information.  In particular, she admitted to
signing signature name affidavits and occupancy affidavits.  In furtherance of her defense
that the loan applications were forged, Ms. Holmes presented testimony from a
handwriting expert, who testified that he could not determine whether or not the
signatures on the loan applications were those of Ms. Holmes.

[6] Special Agent Herron and Ms. Holmes testified that the interview occurred in August
2006.

she had been a victim in the fraudulent scheme.[7]  Special Agent Herron testified that Ms. Holmes admitted she had signed the loan applications for two properties that contained the false information concerning her financial status and her intent to live in the properties.[8]  Ms. Holmes also admitted to signing an affidavit at the request of Special Agent Herron, an affidavit in which she stated that she had signed the loan applications for two of the properties.  At trial, Ms. Holmes stated that she told Special Agent Herron during her interview she had not read the loan applications.  She also testified that she signed the affidavit only because Special Agent Herron confronted her at her workplace and she wanted Special Agent Herron to remove himself from there as quickly as possible.  However, at trial, Ms. Holmes admitted that she knew she did not make as much money as appeared on the loan applications and that she knew she did not intend to reside in the homes, acknowledging that it does not require knowledge of real estate transactions to understand that the information was incorrect.

*Benefits Received*

It is undisputed that Ms. Holmes received several checks outside of the closing monies exchanged.  The government alleged that Ms. Holmes received a check for

---

[7] Ms. Holmes purportedly represented herself as a victim to Special Agent Glaser during an interview in February 2006.

[8] Ms. Holmes admitted to signing the loan applications for the properties at 7917 W. 155th Place and on Birch Street, in Overland Park, Kansas.  She told Agent Herron that she was not sure whether she had signed the loan application and real estate contract for a residence at 7864 W. 155th Place, but that she had always been told by Mr. Washington, Sr. that she owned a third property.

$30,000 from James and Doris Moser and a check for $5,000 in exchange for her role in the fraudulent scheme. Ms. Holmes testified that Mr. Washington, Sr. told her the $30,000 check constituted proceeds from a house, and that the $5,000 check was rent. These amounts were not listed by Ms. Holmes as rental income for purposes of her income taxes, but she stated at trial that Mr. Washington, Sr. had told her she did not need to report them as income. She spent this money on various personal items, such as furniture, and on payment of bills.

Ms. Holmes admitted to receiving another check for $37,864 from Custom Legacy Development, which had been used to artificially inflate her bank account for the purpose of deceiving the loan company as to her assets at the time of loan approval. According to Ms. Holmes, Mr. Washington, Sr. told her to put this money into her account and explained that the money was for the houses. The government presented evidence that Custom Legacy Development was actually a business owned by Mr. Washington, Jr. Ms. Holmes testified at trial that she had not understood what the money had been for and simply placed it in her account on the representations of Mr. Washington, Sr. that the money was for the houses. A stop payment was placed on this check.

Ms. Holmes also received a check for $2,478.02 from Mr. Washington, Sr. that was used as a down payment on one of the homes. Finally, an outstanding bill of $1, 540 was paid to St. Luke's Credit Union from the proceeds of one of the closings. Special Agent Herron testified that Ms. Holmes initially denied receiving any money from the real estate transactions, but admitted to receiving these checks after he confronted her

with the payment of the debt at St. Luke's. At trial, Ms. Holmes admitted that she received these checks and that the debt to St. Luke's was paid on her behalf, but presented a defense that she did not understand the purpose of these transactions. As for the debt at St. Luke's, she testified that she was never informed of the payment of that debt beforehand.

Sherri Lynn Wattenbarger, a trial attorney for the Department of Justice, Office of U.S. Trustee, testified that Ms. Holmes filed a bankruptcy petition in the Western District of Missouri, in an attempt to get a discharge of the debts from the purchase of these homes. Ms. Wattenbarger explained that the court denied her request and her debt was consequently not discharged.

*The Real Estate Transactions*

Ms. Holmes purchased three properties, in all of which James and Doris Moser had an ownership interest. Each was in foreclosure at the time of sale. The transactions are discussed in detail below.

1. The Property at 7917 W. 155th Place

In July 2004, Ms. Holmes purchased a home at 7917 W. 155th Place, for $314,000. The original price for the property set forth in the real estate contract was $305,000, but on the day of closing, Ms. Holmes agreed to pay $314,000 instead, and she and the sellers signed an addendum to the contract providing for the change. National City Mortgage

provided Ms. Holmes with the loan to purchase the property, and Denise Robinett of Kansas Secured Title served as the closing agent for the sale of the property. Mr. Washington, Sr.'s signature appeared on the loan application as the broker.

Ms. Robinett testified that Ms. Holmes, Mr. Washington, Sr. and Mr. Moser, the seller, were all present at Ms. Holmes's closing. She explained that the mortgage broker (Mr. Washington, Sr.) is typically present at closing. However, she found Mr. Moser's presence to be unusual, as the buyers and sellers typically sign the relevant documents at different times (i.e., there is a "buyer's closing" and a "seller's closing"). Moreover, the sellers received nearly $40,000 from the sale of the property despite the fact that the property was in foreclosure.[9]

Ms. Robinett testified that she had Ms. Holmes and Mr. Washington, Sr. sign the loan application in her presence at closing. She explained that the real estate contract was the only document she received already signed by Ms. Holmes. During the closing, she had Ms. Holmes initial each page of the application, and she viewed and made photocopies of Ms. Holmes's driver's license and social security card to verify her identity. Ms. Holmes denied signing the application and testified that she did not provide the information contained therein. She claimed that the signature was a forgery and testified that she did not recall seeing the document itself at the closing. She also testified that she did not sign the original sales contract for the property, although she admitted that she signed various documents at the closing itself, such as signature name affidavit

---

[9] James and Doris Moser received $39,490.34.

and occupancy affidavit, both of which were notarized by Ms. Robinett. However, Ms. Holmes also admitted that she reviewed the information contained in the loan application at closing, and conceded that the closer probably asked her questions such as whether her listed income was correct. She explained that Mr. Washington, Sr. had told her that you obtain investment properties by increasing your monthly income. She also testified that she blindly signed documents based upon his representations.

Mr. Lynn Rowland, a mortgage banker for National City Mortgage at the time of the transaction, testified that Ms. Holmes would not have qualified for the loan she received based upon her actual income. He also noted that the standard loan application contains language immediately above the signature line acknowledging that the undersigned represents the information is true and correct and that a misrepresentation on the application could result in civil liability or criminal penalties.

## 2. The Property on Birch Street

In September 2004, Ms. Holmes purchased a home on Birch Street, for $360,000. People's Choice Home Loan, Inc. provided Ms. Holmes with two loans to purchase the property, and Denise Robinett again served as the closing agent. Thomas Carlson's signature appeared on the loan applications as the broker. Mr. Carlson was not present at closing, and Ms. Robinett testified that she did not know him. She explained that she had worked on the sale with "Amstar," represented by Mr. Washington, Jr. and Mr.

Washington, Sr.  Ms. Robinett also testified that the Washingtons, operating as Amstar, received $4,329 on the sale.[10]  Although the property was in foreclosure, the Mosers again received nearly $40,000 from the sale.[11]

Ms. Holmes testified that she did not sign the loan applications or provide the information contained within it.  She testified that the signatures on the loan applications were forgeries.  However, as with the other properties, Ms. Holmes admitted that she signed other documents at closing and that the closer "probably" reviewed the information on the forms with her.

During the closing on this property, Kansas Secured Title drafted a check payable to South and Associates, a law firm representing the lender of the sellers, for $312,617.80, to pay off the mortgage incurred by the sellers, as well as foreclosure costs. This check was paid from the proceeds of the loan obtained by Ms. Holmes.  The government charged Ms. Holmes and Mr. Washington, Sr. with money laundering in connection with this financial transaction.

Ms. Robinett testified that the lender for the sale of this property required as a condition of the loan that the closing documents be sent to the lender immediately after closing.  Pursuant to her usual practice, Ms. Robinett sent the closing documents to the lender via FedEx Priority Overnight, after the closing on September 9, 2004.  Ms. Robinett also testified that it was standard industry practice for the loan documents to be

---

[10] This amount included $9 for a credit report.
[11] They received $39,954.62 for the sale of the Birch property.

sent back to the lender overnight in order for the lender to have them right away. At every closing, these documents would be immediately sent back to the lender. The transmission of these closing documents to the lender formed the basis of the commercial carrier fraud charge of which the jury found Ms. Holmes guilty.

3. The Property at 7864 W. 155th Place

In September 2004, Ms. Holmes purchased a home at 7864 W. 155th Place, for $365,000.[12] BNC Mortgage provided Ms. Holmes with the loan to purchase the property, and Colleen Asmus of Missouri Secured Title[13] served as the closing agent for the sale of the property.[14] Ms. Yolanda Carrington's signature appeared on the loan application as the broker, for Premier Mortgage Funding.[15] Ms. Asmus stated that she did not know Ms. Carrington and that she was not present at closing. She had received the loan application already signed. Ms. Asmus explained that she understood Amstar Mortgage to be the broker, and that she worked with Mr. Washington, Sr. and Ima Bennett on the sale of the property. She testified that Mr. Washington, Sr. was present at closing as the broker. She additionally testified that Amstar had been listed as the broker

---

[12] The sellers of this property included Robin and Leanna Williams, and James and Doris Moser.

[13] Kansas Secured Title and Missouri Secured Title were affiliated companies operating on different sides of the state line.

[14] Closing on this property occurred in Liberty, Missouri, although the property was located in Kansas

[15] Ms. Carrington owned a legitimate branch of Amstar Mortgage in the St. Louis metropolitan area, specifically Creve Coure.

on a HUD-1 form that had been filled out. She understood Amstar and Premier Mortgage to be run by the same persons. As with the other properties, the sellers received money from the sale despite the foreclosure status of the property.[16]

Kimberly Fine, a branch manager for BNC Mortgage, testified that Jason McMillan, an underwriter from BNC, called Ms. Holmes to verify her income prior to closing. Ms. Fine explained that it was company policy to call the borrower and verify income, and that the loan would not have been funded had this not happened. Jason McMillan had signed off on documentation for BNC indicating he had called Ms. Holmes, and Ms. Fine testified that she had no reason to question Mr. McMillan's representation, noting that Mr. McMillan would have lost his job had he lied about this and a fraudulent loan approved. At trial, Ms. Holmes denied that anyone called her to verify her income. Ms. Fine explained that Ms. Holmes would not have qualified for the loan she received if the income information had been accurately reported.

Ms. Asmus testified that she reviewed the paperwork with the borrower during closing and then had them sign. She explained that she followed this process with Ms. Holmes. Ms. Asmus actually received the application with signatures already on it, and she therefore had Ms. Holmes re-sign it in her presence at closing. She also testified that she looked at Ms. Holmes's driver's license and social security card, to verify her identity. Ms. Asmus notarized several documents at closing, and to do so, the borrower had to provide a state-issued identification card. Ms. Holmes denied having signed the

---

[16] For the sale of this property, the Mosers received $5,000.

loan application or the contract for the purchase of the property, and she stated that she could not recall whether she saw the loan application at closing. As with the other transactions, she did admit, however, that the closer probably reviewed the information with her, verifying certain relevant information that was inaccurately recorded on the loan application. Likewise, she admitted that she knew she did not make as much money as listed on the loan application, and that she did not intend to reside on the property.

In the course of attempting to close on the loan, Ms. Asmus faxed a title commitment[17] and invoice from her office in Missouri to Ima Bennett in Kansas, at (913)-814-0467. She faxed it to Ms. Bennett as a representative of Amstar. She explained at trial that this was necessary for the transaction, because the lender required it with any loan. The faxing of this title commitment and invoice formed the basis of a wire fraud charge.

## II. Standards

Ms. Holmes moves for a new trial, seemingly alleging a violation of the government's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).[18] Federal Rule of Criminal Procedure 33 provides that "the court may vacate any judgment

---

[17] Ms. Asmus explained that a title commitment lists who owns the property and whether there are mortgages on the property, and provides important information concerning the buyer and seller.

[18] Although it is not entirely clear in the memorandum accompanying Ms. Holmes's motion that she alleges a *Brady* violation, the Court construes it as such because she stated in the motion itself that "evidence was not made available to her."

and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33. "A motion for a new trial is not regarded with favor and is only issued with great caution." *United States v. Herrera*, 481 F.3d 1266, 1269-70 (10th Cir.2007) (citing *United States v. Trujillo*, 136 F.3d 1388, 1394 (10th Cir.1998)). The decision whether to grant a motion for new trial is committed to the sound discretion of the trial court. *United States v. Stevens*, 978 F.2d 565, 570 (10th Cir.1992).

As for Ms. Holmes's Motion for Judgment of Acquittal, the Court must uphold the jury's verdict of guilty if "'any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt.'" *United States v. Urbano*, 563 F.3d 1150, 1156 (10th Cir.2009), *cert. denied*, 130 S.Ct. 434, 175 L.Ed.2d 297 (2009) (quoting *United States v. Doddles*, 539 F.3d 1291, 1293 (10th Cir.2008)). The court must "'ask only whether taking the evidence-both direct and circumstantial, together with the reasonable inferences to be drawn therefrom-in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.'" *United States v. Erickson*, 561 F.3d 1150, 1158 (10th Cir.2009), *cert. denied*, 130 S.Ct. 173, 175 L.Ed.2d 109 (2009) (quoting *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir.1999)). "'While the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt.'" *Erickson*, 561 F.3d at 1158-59 (quoting *United States v. Burkley*, 513 F.3d 1183, 1188 (10th Cir. 2008), *cert. denied*, 128 S.Ct. 2979, 171 L.Ed.2d 902 (2008)).

III. Analysis

A. Motion for New Trial

Ms. Holmes moves for a new trial on the grounds that the government presented insufficient evidence to convict and that it failed to disclose crucial evidence prior to trial in violation of the government's obligations under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).[19] The Court will address the allegation of insufficient evidence in connection with Ms. Holmes's Motion for Judgment of Acquittal below, and thus turns to Ms. Holmes's *Brady* claim. In order to establish a *Brady* violation, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material. *United States v. Combs*, 267 F.3d 1167, 1172 (10th Cir .2001) (citing *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir.1999)). The government argues that the defendant is not entitled to a new trial both because the evidence, inadvertently suppressed, was not exculpatory or

---

[19] In her Motion for New Trial, Ms. Holmes states that the trial court erred in sustaining the government's objections to her attempt to impeach Ms. Denise Robinett, a witness at trial, with prior inconsistent statements made as a witness at the trial of co-defendant Wildor Washington, Sr. However, Ms. Holmes then states that the Court erred in limiting Ms. Holmes' cross examination of Ms. Robinett "as to issues that were revealed in the memorandum of interview" of Ms. Asmus and Ms. Robinett prepared by the HUD Special Agent, which Ms. Holmes claims were disclosed on March 9, 2010, four days after the jury returned its verdict as to Ms. Holmes. It is unclear how the Court could have limited Ms. Holmes' cross-examination of matters discussed in reports that had not yet been disclosed to the defendant. Moreover, Ms. Holmes does not explain what inconsistent statements she believes Ms. Robinett previously made at the trial of co-defendant Mr. Washington, Sr. which could have impeached her testimony at trial. Thus, the Court construes this assertion as an argument that the government failed to disclose material, favorable impeachment evidence under *Brady.*

impeachment evidence and was not material in any event. The Court concludes that the evidence was not material and, as a result, denies the defendant's Motion for New Trial.

A Special Agent for the Department of Housing and Urban Development (HUD) spoke with two of the prosecution's trial witnesses, Denise Robinett and Colleen Asmus, and documented these discussions in reports subsequently prepared. The government concedes that it did not provide these reports to Ms. Holmes prior to trial, alleging that it was not aware of their existence until after the trial concluded.[20] These reports form the basis for Ms. Holmes's Motion for New Trial. Ms. Holmes asserts that the reports raised the following issues which could have been addressed by the defense during the cross-examination of Colleen Asmus:

" 1. Whether or not Robin Williams, James Moser and/or Doris Moser were the owners of 7864 W. 155th Place, Overland Park, Kansas?

2. Whether or not Chris Rodriquez, Asmus supervisor, President of Title Midwest, parent company of Missouri Secured Title and Kansas Secured Title were parties to the scheme and/or alleged conspiracy?

3. What contact did Asmus have with Ima Bennett, loan processor for Amistar Mortgage Company.

4. Why was Chris Rodriquez not listed as a party to the alleged conspiracy?

---

[20] Thus, the Court likewise recognizes that the suppression element of Ms. Holmes's *Brady* claim has been satisfied. *See Smith v. Sec'y of New Mexico Dept. of Corr.*, 50 F.3d 801, 823 (10th Cir. 1995).

5.  Where are the documents pertaining to the September 8, 2004 Ocwan Federal Bank pay off quote regarding 7864 W. 155th Place?

6.  Who was present at the closing on 7864 W. 155th Place in Missouri?

7.  What documents were faxed by Washington to Asmus on 7864 W. 155th Place closing on the loan?

8.  What documents were handed to Holmes by Washington to sign at closing?

9.  What documents are missing from the file of the closing of 7864 W. 155th Place?"

Ms. Holmes also asserts that the following issues could have been raised in cross-examination of Denise Robinett:

"1.  Whether or not Denise Robinett revealed the connection between Chris Rodriquez, James Moser for Heritage Financial Investment and Wildor Washington, Sr. of Amistar Mortgage?

2.  Whether or not there were 2 sales contracts for 7917 W. 155th Place, Overland Park, Kansas.

3.  Whether or not Jeanne McDonough, closer, National City Mortgage dba Commonwealth United Mortgage received verification from Holmes as to the funding of a loan to 7917 W. 155th Place?

4.  Whether or not there was a valid closing with Holmes when she was classified by Robinett as a "Dumb Buyer?"

5.  Whether or not Robinett read occupancy forms to Holmes to occupy 7917 W. 155th Place?

6.  Whether or not Robinett read occupancy forms to Holmes to occupy 15718 Birch, Overland Park, Kansas when Holmes had already signed occupancy forms for 7917 W. 155th Place?

7.  Whether or not Holmes was an investor at the closing on the loan for 15718 Birch?"

Evidence that could be used to impeach a trial witness falls within *Brady* as "favorable" evidence.  *See United States v. Headman*, 594 F.3d 1179, 1183 (10th Cir. 2010).  Even if the information contained in the Special Agent's report would have provided Ms. Holmes with impeachment evidence in any of the respects listed above,[21] the Court concludes that the evidence would not have been material within the meaning of *Brady*.  A *Brady* claim "requires proof that the evidence was 'material either to guilt or to punishment.'"  *Combs*, 267 F.3d at 1175 (citing *Smith*, 50 F.3d at 826).  "'A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.'" *Smith*, 50 F.3d at 826 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)). Evidence is therefore material "'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A "reasonable probability" is a probability sufficient to undermine confidence

---

[21] Ms. Holmes did not provide the Court with any explanation of what was contained in the report in any event.  Moreover, many of these issues were addressed through evidence presented at trial, and the potential guilt of unindicted co-conspirators would not in any event warrant this Court granting a new trial.  Indeed, the jurors were instructed to disregard the potential guilt of other, unnamed individuals in assessing that of Ms. Holmes.

in the outcome.'" *United States v. Hughes*, 33 F.3d 1248, 1251 (10th Cir.1994) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In light of the corroborating testimony presented at trial, and Ms. Holmes's own admissions, the Court finds that it would not have produced a different result in this case to have questioned Ms. Asmus or Ms. Robinett about these matters. First, the government did present significant testimony to corroborate that of Ms. Asmus and Ms. Robinett. Special Agent Herron testified that Ms. Holmes stated to him that she signed two of the loan applications knowing the information contained therein was inaccurate, in that her income was overstated and that she would not be using the homes as a residence. Indeed, she signed an affidavit admitting to the same, and conceded that she had done so at trial.[22] Ms. Holmes also admitted that she had signed certain documents at closing that contained inaccurate information, such as the occupancy affidavit. Lastly, Ms. Holmes admitted at trial that she knew she did not make as much money as set forth in the loan applications and knew that she did not intend to use any of the homes as her primary residence. She acknowledged that Ms. Robinett and Ms. Asmus "probably" reviewed with her the information contained in the applications at the time of closing. She additionally admitted to having received all of the checks issued to her, as well as the pay-off of her debt at St. Luke's, as a result of these real estate transactions.

Thus, any slight impeachment value that the Special Agent's report *may* have had would have paled in comparison to the significant evidence of Ms. Holmes's guilt.

---

[22] As previously explained, Ms. Holmes testified at trial that she signed the affidavits out of a desire to expedite Special Agent Herron's exit from her workplace.

Therefore, the Court concludes that the materiality requirement of *Brady* has not been satisfied, and the Court consequently denies Ms. Holmes's Motion for New Trial.

## B.  Motion for Judgment of Acquittal

In her Motion for Judgment of Acquittal and Motion for New Trial, Ms. Holmes asserts that the government presented insufficient evidence to support her conviction on any of the counts.

### 1.  Conspiracy

Count 1 of the Indictment charged Ms. Holmes with conspiring to commit wire and commercial carrier fraud, in violation of 18 U.S.C. § 371.  To obtain a conviction for conspiracy under 18 U.S.C. § 371, the government must prove (1) the defendant's agreement with another person to violate the law; (2)  the defendant's knowledge of the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily took part in the conspiracy; and (4) the coconspirators were interdependent.  *United States v. Rahseparian*, 231 F.3d 1267, 1272 (10th Cir. 2000).  "Simply stated," the government had to prove that Ms. Holmes had "an explicit or implicit agreement with [his coconspirators]" to commit wire and common carrier fraud.  *Id. See also United States v. Chavis*, 461 F.3d 1201, 1208 (10th Cir. 2006).

"To prove an agreement, the government need not offer direct proof of an express agreement on the part of the defendant.  Instead the agreement may be informal and may

be inferred entirely from circumstantial evidence." *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004) (quoting *United States v. Lang*, 364 F.3d 1210, 1223 (10th Cir. 2004), *vacated on other grounds by Lang v. United States*, 543 U.S. 1108 (2005)). "Although 'mere association' with conspirators is insufficient to support a conspiracy conviction, 'frequent contacts' among conspirators and 'their joint appearances at transactions and negotiations' tend to show the existence of an agreement." *United States v. Aragon*, 141 F.3d 1186, 1998 WL 166059, at *3 (10th Cir. Apr. 10, 1998) (table op.) (quoting *United States v. Evans*, 970 F.2d 663, 669 (10th Cir.1992)); *see also United States v. Kelley*, 187 Fed.Appx. 876, 884 (10th Cir.2006) ("Although no government witness testified about an express agreement between [the co-defendants], the prosecution presented ample evidence to allow the jury to infer reasonably that such an agreement existed."). Under the essential objective element, "the government must prove that the alleged conspirator had a general awareness of both the scope and the objective of the enterprise." *Pulido-Jacobo*, 377 F.3d at 1130 (quoting *Evans*, 970 F.2d at 670). A jury may presume that "a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy." *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir.1994); *United States v. Carter*, 130 F.3d 1432, 1440 (10th Cir.1997). "Interdependence exists where each coconspirator's actions constitute essential and integral steps toward the realization of a common, illicit goal." *Pulido-Jacobo*, 377 F.3d at 1131 (quoting *Carter*, 130 F.3d at 1440).

Ms. Holmes generally challenges whether the government presented sufficient evidence to convict her of conspiracy to defraud, without specifying any particular element she believes the government failed to establish. Nonetheless, the Court has considered the evidence presented by the government and concludes that there existed considerable evidence from which the jury could reasonably have found Ms. Holmes was a member of the conspiracy charged. First, Special Agent Henry Herron testified that Ms. Holmes admitted to him that she had signed two of the loan applications knowing they contained inaccurate information. Indeed, Ms. Holmes admitted to having signed these loan applications in a signed affidavit, purportedly at the urging of Mr. Washington, Sr. From this testimony, the jury could reasonably conclude that Ms. Holmes had agreed with Mr. Washington, Sr. to participate in a scheme to defraud within the meaning of the mail and wire fraud statutes. But the government also presented additional evidence from which the jury could infer such an agreement. The government presented testimony from the closing agents for each of the properties, Ms. Robinett and Ms. Asmus, that Ms. Holmes signed the loan applications in their presence. Ms. Robinett and Ms. Asmus also each testified that they obtained government issued identification from Ms. Holmes to ensure that the correct individual was signing the closing documents. While Ms. Holmes asserted that the signatures on the loan applications were forgeries, there was abundant evidence from which the jury could have concluded that Ms. Holmes signed the applications, and did so aware of their content. For example, Ms. Holmes testified that Mr. Washington, Sr. had informed her that investment property is obtained by inflating the income figure. Ms. Holmes also admitted to signing the occupancy affidavits and

other important documents at closing. Moreover, the jury could have reasonably inferred that Ms. Holmes agreed with Mr. Washington, Sr. to commit a fraud upon the lender. Ms. Robinett testified that Mr. Washington, Sr. was present at the closing on the property at 7917 W. 155th Place, and that "Amstar," represented by Mr. Washington, Sr., was the actual broker on the closing for the Birch property. With respect to the property at 7864 W. 155th Place, Ms. Asmus testified that she understood Amstar Mortgage to have been the broker and that she worked with Mr. Washington, Sr. on the sale. Ms. Holmes also testified about Mr. Washington, Sr.'s primary role in the transactions. There was therefore considerable evidence for the jury to have concluded that Ms. Holmes signed the fraudulent loan applications knowing that they contained inaccurate information[23] and that she conspired with Mr. Washington, Sr. to defraud the lender. Thus, the Court denies Ms. Holmes's Motion for Judgment of Acquittal and Motion for New Trial on Count 1 of the Indictment on the basis of insufficient evidence.

---

[23] Ms. Holmes asserts in the memorandum accompanying her motion that the evidence at trial supported her testimony that Mr. Washington, Sr. perpetrated a fraud on her, such as by giving Ms. Holmes a check for $37,864.00 to artificially inflate her bank account. However, the Court instructed the jury that it could infer Ms. Holmes had the requisite knowledge if she deliberately blinded herself to the existence of a fact, and there was a significant amount of evidence to support such a finding. Instruction number 25 explained that "[k]nowledge can be inferred if the defendant was aware of a high probability that the Uniform Residential Loan Applications contained material false representations, such as: false representations about the amount of Emma Holmes's income and false representations that the houses would be her primary place of residence." As noted above, there was also sufficient evidence, including the statements of Ms. Holmes, for the jury to infer that Ms. Holmes knew the purpose of those deposits and participated in the scheme alongside Mr. Washington, Sr.

2.  Wire Fraud

The government charged Ms. Holmes with wire fraud in connection with the sale of the property at 7864 W. 155th Place.  To establish that Ms. Holmes committed wire fraud, the government had to prove: (1) Ms. Holmes engaged in a scheme to defraud; (2) she did so with the intent to defraud; and (3) use of interstate wire or radio communications to execute the scheme.  *See United States v. Lewis*, 594 F.3d 1270, 1274 (10th Cir. 2010).  *See also United States v. Wittig*, 575 F.3d 1085, 1093 (10th Cir. 2009).  As explained in detail above, from the testimony given by Ms. Holmes, Special Agent Herron, Ms. Robinett and Ms. Asmus, the jury could readily conclude that Ms. Holmes was involved in a scheme to defraud with the requisite intent.  Moreover, the government presented undisputed evidence that there was use of interstate wires to execute this scheme.  In particular, Ms. Asmus testified that she faxed a title commitment and invoice from her office in Missouri to Ima Bennett in Kansas, in Ms. Bennett's purported capacity as a representative of Amstar Mortgage.  Moreover, Ms. Asmus explained that the faxing of a title commitment was a necessary step in the loan process, as the lender required a title policy, which the title company could issue only with a title commitment.  As this was an ordinary, expected step in the loan process, the Court concludes that the government presented sufficient evidence of "causation" under the wire fraud statute: that Ms. Holmes had knowledge that the use of an interstate wire would follow in the ordinary course of business, or that such a use could at least reasonably be foreseen, whether or not actually intended.  *See United States v. Maze*, 414 U.S. 395, 399 (1974) (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)).  Consequently, the Court finds that the

government presented sufficient evidence for the jury to reasonably conclude that Ms. Holmes committed the offense of wire fraud with respect to the property located at 7864 W. 155th Place.

### 3. Common Carrier Fraud

A conviction under the mail fraud statute for what was described at trial as common carrier fraud required the government to establish: (1) the devising of a scheme or artifice to defraud or for obtaining money by means of false or fraudulent pretenses, representations or promises; (2) the specific intent to defraud; and (3) the use of the United States mails or a commercial carrier to execute the scheme. See *United States v. Kennedy*, 64 F.3d 1465, 1475 (10th Cir. 1995). *See also* U.S.C. § 1341 (1994). [24] As with the other charges, Ms. Holmes challenges generally the sufficiency of the evidence the government presented to support her conviction. However, Ms. Holmes also asserts more specifically that the government has not presented sufficient evidence of any "connection" between Ms. Holmes and the commercial carrier, or that Ms. Holmes caused the wiring of documents by a commercial carrier. In light of the elements of common carrier fraud, the Court construes this argument as implicating two requirements: (1) that the defendant caused the common carrier to be used and (2) that the mailing was sufficiently related to the scheme to defraud.

---

[24] The indictment alleges that the closing documents were sent by FedEx, a common carrier, rather than through the United States Mail.

One "causes" the mails to be used where one "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Maze*, 414 U.S. at 399 (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)).[25] As the Tenth Circuit has recently explained, "the government must prove that he defendant 'set forces in motion which…would involve mail uses.'" *United States v. Ruiz*, 589 F.3d 1310 (10th Cir. 2009) (quoting *United States v. Worley*, 751 F.2d 348, 350 (10th Cir. 1984)). The question of causation hinges upon "'whether the defendant could reasonably foresee the occurrence of mailings.'" *Id.*

The charge of commercial carrier fraud was predicated upon the closing agent's sending by FedEx certain closing documents relating to the sale of the Birch property. Denise Robinett, the closing agent for the Birch property, testified at trial that she sent signed documents to People's Choice Home Loan, Inc., the lender for the Birch property, subsequent to the closing. In a manner consistent with her usual business practice, she sent these via FedEx, a commercial carrier. Ms. Robinett explained that it was a standard policy within the loan industry for the signed closing documents immediately to be sent overnight to the lender after closing occurred. She testified that the transmission of these documents was a necessary step in the loan process, since the lender required it as a condition of the loan. Moreover, some of the documents that Ms. Robinett testified Ms. Holmes signed at closing prominently indicated that the lender was located in Irvine,

---

[25] The legal standards for mail fraud are applicable.

California.  For example, the settlement statement, which Ms. Holmes purportedly signed, listed the lender and the lender's address next to the names and addresses of the borrower and seller.  Moreover, the mortgage, which Ms. Holmes signed and each page of which Ms. Holmes initialed, stated at the top:

> Return to:    People's Choice Home Loan, Inc.
> 7515 Irvine Center Dr. Irvine, CA 92618

Given this testimony and evidence, the Court finds that it was reasonably foreseeable to Ms. Holmes that the closing documents would be transmitted to the lender via a mailing or common carrier.  While Ms. Holmes asserts that she had no knowledge that the documents would be so transmitted, the Tenth Circuit has explained that actual knowledge of the use of the mails is not required; the conviction may rest solely upon the foreseeability of the mailing.  *United States v. Sasser*, 974 F.2d 1544, 1555 (10th Cir. 1992).  Indeed, the Tenth Circuit has concluded that mailings between an attorney and insurance adjuster were reasonably foreseeable to a defendant who submitted falsified medical records and bills to the attorney in an attempt to receive reimbursements from the insurance company, despite the defendant's alleged ignorance that the mails would be so used.  *United States v. Warren*, 747 F.2d 1339, 1345 (10th Cir. 1984).  Similarly, whether or not Ms. Holmes actually intended for the documents to be so transmitted, she may be guilty of common carrier fraud, as it is reasonably foreseeable to such a buyer that all of the documents she signs at closing for the purpose of obtaining the loan would ultimately have to be sent back to the lender, in the ordinary course of business.  As Ms. Holmes also had notice of the lender's California location, it was reasonably foreseeable to her

that the documents she executed would have to be mailed or transmitted back to the lender by common carrier. *See United States v. Edelmann*, 458 F.3d 791, 812 (8th Cir. 2006) (finding the mailing of closing documents to the lender to be reasonably foreseeable to the buyer where the settlement sheet the buyer executed at closing provided for a $45 fee for return of the documents to the lender, thus providing the buyer with notice of the mailing). Ms. Holmes may therefore be said to have "caused" the use of a commercial carrier.

Moreover, the government presented evidence that Ms. Robinett sent the documents to the lender via FedEx Priority Overnight subsequent to the closing on September 9, 2004. Ms. Robinett not only testified to this effect, but the government also admitted into evidence the FedEx shipping label. Thus, aside from the issue of whether the use of FedEx was sufficiently related to the scheme to defraud, the Court finds the government presented sufficient evidence for the jury to reasonably conclude that Ms. Holmes committed the offense of common carrier fraud.

The Court thus turns to the question of whether the transmittal of documents could be deemed in execution of a scheme to defraud. A mail fraud conviction requires not only that the defendant "caused" the mails, or a common carrier, to be used, but also that the transmission was "sufficiently closely related" to the scheme to defraud. *Maze*, 414 U.S. at 399. Thus, "the mailing must be 'for the purpose of executing the scheme.'" *Id.* at 400 (quoting *Kann v. United States*, 323 U.S. 88, 94 (1944)). To satisfy this "purpose" requirement, the transmission must be "'part of the execution of the scheme as conceived

by the perpetrator at the time.'" *United States v. Redcorn*, 528 F.3d 727, 738 (10th Cir. 2008) (quoting *Schmuck v. United States*, 489 U.S. 705, 715 (1989). However, the scheme need not "'contemplate the use of the mails as an essential element.'" *Maze*, 414 U.S. at 400 (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)). As the 10th Circuit has explained: "[t]he defendant need not have made the transmission personally, merely caused it to be made. It need not be at the heart of a scheme, nor necessary or even helpful for its success; it need not itself be false or deceptive." *Redcorn* at 738. Rather, it will be considered to be for the purpose of furthering a scheme to defraud if "'the transmission is incident to the accomplishment of an essential part of a scheme.'" *Id.* (quoting *United States v. Mann*, 884 F.2d 532, 536 (10th Cir. 1989)).

The transmission in question occurred after Ms. Holmes "received" the loan money and title to the property at closing. Generally, a transmission occurring after the scheme has reached fruition cannot be considered to play an essential role in the fraudulent scheme. *See Redcorn*, 428 F.3d at 741 (explaining that, "as a general proposition," use of the mails or wire after the scheme has reached fruition "will not constitute grounds for a conviction") (quoting *United States v. Taylor*, 789 F.2d 618, 620 (8th Cir. 1986)). As discussed in further detail below, there are exceptions to this general rule, yet the timing of the transmissions still retains significance and therefore it must be determined when the scheme was complete. Here, the indictment stated that the purpose of the scheme was to obtain home loans by submitting false and fraudulent loan applications, in order to enrich the perpetrators. If the fraudulent scheme was to procure

the loans, then the scheme reached fruition only once all the requirements for obtaining the loan were satisfied. Although Ms. Holmes received the loan money and title to the property before the mailing occurred, Ms. Robinett testified that one of the requirements of the loan was the sending of the closing documents to the lender afterwards. Consequently, not all of the loan requirements were satisfied when Ms. Holmes received the loan money and title to the property. Rather, per the agreement, the "loan" was complete only once the documents were sent and it was at this point that the scheme reached fruition. *See United States v. Fiorito*, 2009 WL 3064752, at * 6 (D. Min. Sept. 22, 2009) (slip copy) (concluding that a mortgage fraud scheme had not reached fruition before the required mailing of HUD-1 forms, which occurred after the closings).

As the closing documents were required to be sent in order for the loan to be obtained, the transmission of the documents would have been "contemplated from the outset by a participant in the scheme as a necessary step." *See United States v. McDougal*, 137 F.3d 547, 555 (8th Cir. 1998). Similarly, in *McDougal*, the defendant had obtained a Small Business Administration loan, having misrepresented the purpose of the loan, and asserted that the mailing of a Form 1031 to the Small Business Administration subsequent to receiving the loan money could not form the basis of a mail fraud charge. *Id.* at 555. She argued that the scheme reached fruition when she received the loan money and the mailing therefore could not have been in execution of the scheme. *Id*. The Eighth Circuit concluded that it was in execution of the scheme, explaining that the government had presented evidence that the mailing was "part of the scheme from the

outset." *Id.* There was testimony, for example, that the Form had to be sent in to demonstrate the propriety of the loan to the Small Business Administration, and that the Form was part of the documentation prepared during origination of the loan and present at closing for review. *Id.* Mailing the form was necessary to permit the perpetrator to "retain the fruits of [the] fraud"—it was a required step in the process, and thus would have been contemplated by the perpetrator from the outset. *Id.* Likewise, Ms. Holmes and Mr. Washington, Sr. would have viewed Ms. Robinett's transmission of the closing documents as a necessary step in the process of obtaining the loans by fraudulent means. As a result, the use of the common carrier was part of the execution of the scheme to defraud as the perpetrators conceived it. *See also Fiorito*, 2009 WL 3064752, at * 6 (finding that the mailing of HUD-1 forms after closing was "incident to an essential part" of a mortgage fraud scheme, noting that "the lender would have caused problems for the title company if the lender had not promptly received a signed HUD-1").

In addition, the use of FedEx may be deemed in furtherance of the scheme even if the scheme was complete upon Ms. Holmes receiving the loan money and title to the property. Transmissions occurring after completion of a fraudulent scheme may still be considered to be in execution of the scheme if "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *Maze*, 414 U.S. at 403. *See also United States v. Lane*, 474 U.S. 438, 451-52 (1986). Here, the sending of closing documents via FedEx to the lender after closing lulled the

lender into a false sense of security regarding the soundness of the loans. Had the documents not been sent as required, the lender may have been alerted to the possibility of fraudulent activity. *See Lane*, 474 U.S. at 453 (concluding that the mailing of proof-of-loss forms after receipt of insurance payments lulled the insurer into a false sense of security because the insurer might otherwise have discovered the fraud). Thus, the government presented sufficient evidence that Ms. Holmes caused the transmission of the closing documents via a common carrier for the purpose of executing the scheme to defraud.

The decisions in *United States v. Maze*, 414 U.S. 395 (1974) and *United States v. Redcorn*, 528 F.3d 727 (10th Cir. 2008) do not compel a different result. In *Maze*, the defendant stole a credit card and used it to obtain lodging at various motels. *Maze*, 414 U.S. at 396. The motels forwarded sales invoices to the cardholder's bank, and the bank then mailed them to the victim for payment. *Id*. at 397. These mailings formed the basis for mail fraud charges. The Supreme Court concluded that the mailings were not in execution of the scheme to defraud, as the scheme reached fruition when the defendant checked out of the motels and the subsequent mailings were merely for the purpose of settling accounts among the motels, the bank, and the cardholder. *Id*. at 401-02. As the scheme had reached fruition at the time of the mailings, the mailings were not sufficiently related to the scheme to fall within the scope of the mail fraud statute. In *Redcorn*, a corporate executive transferred embezzled funds into a private bank account and then to his out-of-state investment broker. *Redcorn*, 528 F.3d at 731-33. The final transfer to the

broker formed the basis for a wire fraud charge. The Tenth Circuit concluded that the scheme had reached fruition when the defendant transferred the money into his personal account, and that the subsequent transfer to the broker therefore was not in execution of the scheme to defraud. *Id*. at 742.

*Maze* and *Redcorn* are both distinguishable in that Ms. Holmes was required to send the closing documents to the lender in order to obtain the loan, regardless of the fact that this was to occur after the loan money had been disbursed. As this was a requirement to obtain the loan, the post-closing mailing would have been contemplated by Ms. Holmes and Mr. Washington, Sr. at the time that they sought to obtain the loan. Moreover, in both *Maze* and *Redcorn*, it was noted that the transfers were not for the purpose of concealing the fraudulent activity. *See Maze*, 414 U.S. at 403 (explaining that the mailings were not intended to lull the victims into a false sense of security or postpone detection because the mailings from the motel owners to the bank actually increased the likelihood of detection) and *Redcorn*, 528 F.3d at 741-42 (noting that no evidence had been presented that the wire transfers were necessary to conceal the fraud and pointing out that the transfers actually made the fraud even more obvious). Here, on the other hand, the transmission could be considered to have been for the purpose of concealment.

4. Money Laundering

The government charged Ms. Holmes with money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), "which is aimed at money laundering which promotes the carrying on of an unlawful activity." *U.S. v. McIntosh*, 124 F.3d 1330, 1335-36 (10th Cir. 1997). Section 1956(a)(1)(A)(i) provides in relevant part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity…
>
> shall be sentenced to a fine…or imprisonment…

The government claims that Ms. Holmes violated this provision with respect to the real estate transaction concerning the Birch property. To establish Ms. Holmes's guilt under this provision, the government had to prove beyond a reasonable doubt that she (1) conducted or attempted to conduct a financial transaction; (2) which she knew involved the proceeds of unlawful activity; (3) with the intent to promote or further unlawful activity. *United States v. Torres*, 53 F.3d 1129, 1136 (10th Cir. 1995) (quoting *United States v. Puig-Infante*, 19 F.3d 929, 937 (5th Cir. 1994).

In addition to asserting that the government presented insufficient evidence to convict her of this charge, Ms. Holmes argues specifically that the trial evidence presented was insufficient to establish a connection between her and the check payable to South & Associates for $312,617.80. Given Ms. Holmes's challenge to the money

laundering count, the Court finds that it must consider the propriety of Ms. Holmes's conviction under the rule announced in *United States v. Johnson*, 971 F.2d 562 (10th Cir. 1992). As explained in greater detail below, the Court concludes that the underlying unlawful activity necessary for the money laundering charge (here, wire fraud) and the financial transaction alleged to constitute money laundering are actually the same transaction. Therefore, they are not sufficiently distinct and the money laundering conviction is consequently precluded by the Tenth Circuit's decision in *Johnson*.

The "specified unlawful activity" alleged here was mail fraud, in violation of 18 U.S.C. §1341. *See United States v. Caldwell*, 560 F.3d 1214, 1221 (10th Cir. 2009) ("Specified unlawful activity is defined to include wire fraud") (citing 18 U.S.C. § 1956(c)(7)(A)). According to the government, in submitting falsified loan applications, Ms. Holmes committed mail fraud, and she obtained proceeds of this illegal activity in the form of her loan. For Ms. Holmes to receive the loan, however, the lender required that the seller's mortgage be paid off, and the loan proceeds were therefore used to send $312,617.80 to South & Associates to pay off the mortgage. The government argues that this payment of the seller's mortgage was thus made in promotion of the fraud. However, the real estate transaction could not have been completed without this payment of the seller's mortgage; consequently, these actions constitute one single act of fraud.

In *United States v. Edgmon*, 952 F.2d 1206 (10th Cir. 1991), the Tenth Circuit considered a double jeopardy challenge to a money laundering conviction under § 1956, and after reviewing the legislative history of § 1956, concluded as follows:

"Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered. The senate report on § 1956 expresses the need for a federal criminal offense aimed directly at the activity of laundering the money gained from illegal activity…Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior "specified unlawful activity"… We find that Congress intended money laundering and the "specified unlawful activity" to be separate offenses separately punishable.

*Id*. at 1213-14.


In *United States v. Johnson*, the Tenth Circuit reviewed the holding of *Edgmon*, explaining that it and *United States v. Lovett,* 964 F.2d 1029 (10th Cir. 1992), addressing § 1957, "suggest that Congress intended the money-laundering statutes to apply to transactions occurring after the completion of the underlying criminal activity." *Johnson*, 971 F.2d at 569. With regard to § 1957, the Tenth Circuit explained that Congress could have intended the statute to apply "when the underlying criminal activity occurs simultaneously with a monetary transaction with the proceeds of the activity," but that the statutory language and legislative history suggested instead that "Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity." *Id*. In applying this rule, the Court concluded that wire transfers at issue in *Johnson* could not have been transactions in criminally derived property under §1957, as the same transfers were alleged to have constituted the underlying criminal activity (wire fraud). In other words, the defendant could not have engaged in money laundering where the wire transfers giving rise to the wire fraud charge were the same transfers that the government claimed qualified as a laundering transaction. As the

Seventh Circuit has explained in analyzing *Johnson*, "money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds." *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998). Thus, there must be a discrete predicate crime that produced the proceeds, an act distinct from the conduct constituting money laundering.

Consequently, the Court must assess whether the government has provided evidence of a "transaction meeting the statutory criteria [of § 1956] that takes place after the underlying crime has been completed." *United States v. Kennedy*, 64 F.3d 1465, 1477-78 (10th Cir. 1995). As the Tenth Circuit elaborated in *Kennedy*, "the central inquiry in a money laundering charge is determining when the predicate crime became a 'completed' offense…" *Id*. Here, the government alleges that Ms. Holmes committed money laundering by using money from the loan to pay off the seller's mortgage on the property. However, as Ms. Robinett explained at trial, the payment of the seller's mortgage is a necessary step in the real estate transaction, required for the buyer to obtain clear title to the property. The "scheme to defraud" that forms the underlying criminal activity was described by the government in the Indictment as a scheme to submit false loan applications to obtain the very same home loan. Thus, the underlying criminal activity was not a distinct activity from that which the government argues constitutes money laundering. As a result, the Court concludes that the government has not presented sufficient evidence for a jury to reasonably conclude that Ms. Holmes

committed the offense of money laundering, and the Court grants Ms. Holmes' Motion for Judgment of Acquittal on the money laundering count.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Ms. Holmes's Motion for Judgment of Acquittal (doc. #110) is granted as to Count 4, the money laundering charge, and is otherwise denied, as set forth herein. Ms. Holmes's Motion for New Trial (doc. # 108) is denied.

**IT IS SO ORDERED.**

Dated this 7th day of July, 2010, in Kansas City, Kansas.

<u>s/ John W. Lungstrum</u>
John W. Lungstrum
United States District Judge